# Case No. 18-40605

# In the United States Court of Appeals
# For the Fifth Circuit

DAVID CRUSON; JOHN DENMAN,

Plaintiffs–Appellees,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY,

Defendant–Appellant.

On Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:16-CV-912 (Mazzant, J.)

# BRIEF OF APPELLANT

MORGAN, LEWIS & BOCKIUS LLP
Scott T. Schutte
77 West Wacker Drive, Suite 500
Chicago, IL 60601
(312) 324-1000

MORGAN, LEWIS & BOCKIUS LLP
William R. Peterson
David J. Levy
Thomas R. Davis
Rachel H. Stinson
Jason F. Muriby
1000 Louisiana Street, Suite 4000
Houston, TX 77002
(713) 890-5000

*Counsel for Appellant, Jackson National Life Insurance Company*

# In the United States Court of Appeals
## For the Fifth Circuit

DAVID CRUSON; JOHN DENMAN,

Plaintiffs–Appellees,

v.

JACKSON NATIONAL LIFE INSURANCE COMPANY,

Defendant–Appellant.

On Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:16-CV-912 (Mazzant, J.)

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. The representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

| *Plaintiffs–Appellees*:[1] | *Counsel for Plaintiffs–Appellees*: |
|---|---|
| David Cruson | Lewis T. LeClair |
| | Rudolph "Rudy" Fink IV |
| John Denman | Samuel Franklin Baxter |
| | MCKOOL SMITH, P.C. |
| All persons who, within the applicable statute of limitations, purchased a Perspective series, Elite Access series, or Retirement Latitudes series of variable annuity products from Jackson National Life Insurance Company or its affiliates, and incurred a Surrender Charge during their ownership of such product but excluding the judge and staff to whom this case is assigned and any member of the judge's immediate family. | 300 Crescent Court Suite 1500 |
| | Dallas, TX 75201 |
| | |
| | Gary D. Corley |
| | CORLEY LAW FIRM |
| | 108 North Travis Street |
| | Sherman, TX 75090 |

| *Defendant–Appellant*: | *Counsel for Defendant–Appellant*: |
|---|---|
| **Jackson National Life Insurance Company**, which is wholly owned by Brooke Life Insurance Company, which is a wholly owned subsidiary of Prudential plc | William R. Peterson |
| | David J. Levy |
| | Adam A. Allgood |
| | Thomas R. Davis |
| | Rachel H. Stinson |
| | Jason F. Muriby |
| | MORGAN, LEWIS & BOCKIUS, LLP |
| | 1000 Louisiana Street, Suite 4000 |
| | Houston, TX 77002 |
| | |
| | Scott T. Schutte |
| | MORGAN, LEWIS & BOCKIUS, LLP |
| | 77 West Wacker Drive, Suite 500 |
| | Chicago, IL 60601 |

---

[1] This suit was initially filed by David Cruson and thirteen other individuals: Richard and Eileen Tredinnick, Irwin and Ruth Sears, James R. Glenn, Suzanne Housewright, Jeffrey R. and Karen T. Miller, Dale and Janice Morris, Billy and Carolyn Walker, and Ronald L. Wyatt. These thirteen other individuals have been dismissed from the suit.

*/s/ William R. Peterson*
William R. Peterson
*Attorney of record for*
*Jackson National Life Insurance Company*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. This appeal concerns a nationwide class action and raises significant issues regarding commonality, predominance, and personal jurisdiction, in addition to complex procedural issues regarding waiver and class certification.

# TABLE OF CONTENTS

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument .......................................................iv

Table of Authorities .................................................................. vii

Statement of Jurisdiction............................................................1

Issues Presented ......................................................................2

Introduction ............................................................................3

Statement of the Case................................................................5

Standard of Review..................................................................23

Summary of the Argument........................................................25

Argument.................................................................................27

I.    The District Court Erred Because It Lacks Personal Jurisdiction Over Jackson with Respect to the Claims of Unnamed Class Members Unconnected to Texas. ..................................................27

    A.    The district court lacks personal jurisdiction over Jackson with respect to the claims of customers who purchased annuities outside of Texas. .................................................27

    B.    Jackson did not forfeit its objection to personal jurisdiction by not moving to dismiss the claims of unnamed members of the putative class in its Rule 12(b) motion................................30

        1.    Before certification, the claims of unnamed class members are not before a court and are not subject to dismissal....................................................................30

        2.    Cases involving arbitration clauses confirm this result. ...........32

        3.    No case has provided a reasoned analysis to the contrary. ...................................................................33

| | | 4. | Jackson did not waive its response to Plaintiffs' waiver arguments. | 35 |

C. A court should not certify a class encompassing claims with respect to which the court lacks personal jurisdiction over the defendant. ...........................................................................37

II. The District Court Erred in Analyzing Commonality and Concluding that Common Issues Predominate over Individual Issues..................................................................................................38

A. Individual issues related to contract interpretation predominate over common issues. .......................................40

B. Jackson's affirmative defenses establish that individual issues predominate over common issues. .......................................45

1. Many class members were fully aware of Jackson's calculations of the surrender charges.......................................46

2. Waiver and ratification require individual determinations.............................................................47

3. Reformation turns on individual issues of knowledge. ............50

C. Plaintiffs failed to carry their burden to establish that variations in state law do not defeat predominance and superiority..........................................................................51

III. The District Court Erred in Certifying a Class When Plaintiffs Failed to Provide a Damage Model. .........................................................54

Conclusion & Prayer for Relief ...............................................................57

Certificate of Service ...............................................................................58

Certificate of Compliance .........................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aetna Life & Cas. Co. v. Gunn*,
  628 S.W.2d 758 (Tex. 1982) ..............................................................................43

*Allen v. Holiday Universal*,
  249 F.R.D. 166 (E.D. Pa. 2008) .........................................................................49

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997).............................................................................................29

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ............................................................................37

*Baxter v. Palmigiano*,
  425 U.S. 308 (1976).............................................................................................31

*Biscone v. JetBlue Airways Corp.*,
  681 F. Supp. 2d 383 (E.D.N.Y. 2010).................................................................30

*Bowers v. Jefferson Pilot Fin. Ins. Co.*,
  219 F.R.D. 578 (E.D. Mich. 2004)......................................................................53

*Branch v. CEMEX, Inc.*,
  No. H-11-1953, 2012 WL 2357280 (S.D. Tex. June 20, 2012) .........................36

*Bristol-Myers Squibb Co. v. Superior Ct.*,
  137 S. Ct. 1773 (2017)........................................................................3, 17, 28, 29

*Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*,
  624 F.3d 185 (5th Cir. 2010) ..............................................................................53

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ...........................................................................23, 52

*Champlin Oil & Ref. Co. v. Chastain*,
  403 S.W.2d 376 (Tex. 1965) ...............................................................................50

*Chavez v. Church & Dwight Co., Inc.*,
  No. 17-C-1948, 2018 WL 2238191 (N.D. Ill. 2018)...........................................34

*Chernus v. Logitech*,
  No. CV 17-673(FLW), 2018 WL 1981481 (D.N.J. April 27, 2018) ...........34, 35

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013).........................................................................................54

*Coterill-Jenkins v. Texas Med. Ass'n Health Care Liab. Claim Tr.*,
  383 S.W.3d 581 (Tex. App.—Houston [14th Dist.] 2012, pet.
  denied)..................................................................................................................44

*Davis v. Grammer*,
  750 S.W.2d 766 (Tex. 1988) ...............................................................................51

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006) ................................................................................37

*Elliott v. KB Home N. Carolina, Inc.*,
  752 S.E.2d 694 (N.C. App. 2013)........................................................................33

*Escobar v. Montee*,
  895 F.3d 387 (5th Cir. 2018) .................................................................................1

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
  No. 17-CV-00564 NC, 2017 WL 4224723 (N.D. Cal. Sept. 22,
  2017) ....................................................................................................................34

*Gibson v. Chrysler Corp.*,
  261 F.3d 927 (9th Cir. 2001) ...............................................................................30

*Goodpasture, Inc. v. M/V Pollux*,
  602 F.2d 84 (5th Cir. 1979) .................................................................................45

*Gutierrez v. Wells Fargo Bank, NA*,
  889 F.3d 1230 (11th Cir. 2018) ...........................................................................32

*Hafer v. Vanderbilt Mortg. & Fin., Inc.*,
  793 F. Supp. 2d 987 (S.D. Tex. June 24, 2011) ..................................................33

*Hanson Pipe & Products, Inc. v. Bridge Techs., LLC*,
  351 F. Supp. 2d 603 (E.D. Tex. 2004)..................................................................36

*Hooks v. Samson Lone Star, Ltd. P'ship*,
  457 S.W.3d 52 (Tex. 2015)...................................................................................47

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
  352 S.W.3d 462 (Tex. 2011) ...............................................................................42

*In re Centurylink Sales Practices and Securities Litigation*,
  MDL No. 17-2795, 2018 WL 2122869 (D. Minn. 2018)...................................34

*In re Checking Account Overdraft Litigation*,
  780 F.3d 1031 (11th Cir. 2015) ............................................................25, 32, 49

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) ...............................................................................37

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  491 F. Supp. 2d 690 (S.D. Tex. 2007)..................................................................37

*In re Monumental Life Ins. Co.*,
  365 F.3d 408 (5th Cir. 2004) .........................................................................38, 46

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) .............................................................................24

*Jernigan v. Langley*,
  111 S.W.3d 153 (Tex. 2003) ................................................................................47

*Koon v. United States*,
  518 U.S. 81 (1996)................................................................................................23

*Laguna v. Coverall N. Am., Inc.*,
  No. 09-2131, 2011 WL 3176469 (S.D. Cal. July 26, 2011)...............................33

*Latshaw v. Johnston*,
  167 F.3d 208 (5th Cir. 1999) ...............................................................................27

*Ludlow v. BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015) ...............................................................................54

*Marbury Law Grp., PLLC v. Carl*,
  729 F. Supp. 2d 78 (D.D.C. 2010)); ...................................................................36

*Milner v. Milner*,
  361 S.W.3d 615 (Tex. 2012) ................................................................................40

*Mitchell v. Forsyth,*
   472 U.S. 511 (1985)) ..........................................................................................1

*Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*,
   907 S.W.2d 517 (Tex. 1995) ...............................................................44

*New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*,
   477 F. App'x 809, 813 (2d Cir. Apr. 30, 2012)..................................................40

*O'Sullivan v. Countrywide Home Loans, Inc.*,
   319 F.3d 732 (5th Cir. 2003) ...............................................................24

*Parsons v. Whirlpool Corp.*,
   No. 17-13561, 2018 WL 2296473 (E.D. Mich. May 21, 2018).........................34

*Pederson v. La. State Univ.*,
   213 F.3d 858 (5th Cir. 2000) ...............................................................23

*Pennzoil Co. v. F.E.R.C.*,
   645 F.2d 360 (5th Cir. 1981) ...............................................................42

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*,
   473 S.W.3d 296 (Tex. 2015) ...............................................................42

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
   721 F.3d 95 (2d Cir. 2013) ...........................................................3, 30

*Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*,
   No. 14 C 2032, 2018 WL 1255021 (N.D. Ill. Mar. 12, 2018)...........................29

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
   601 F.3d 1159 (11th Cir. 2010) .............................................38, 47, 53

*Sage St. Assocs. v. Northdale Const. Co.*,
   863 S.W.2d 438, 445 (Tex. 1993) .......................................................40

*Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*,
   319 F.3d 205 (5th Cir. 2003) ...............................................................23

*Seiferth v. Helicopteros Attuneros, Inc.*,
   472 F.3d 266 (5th Cir. 2006) ...............................................................29

*Slade v. Progressive Sec. Ins. Co.*,
  856 F.3d 408 (5th Cir. 2017) ....................................................................26, 54, 56

*Sloan v. General Motors*,
  287 F. Supp. 3d 840 (N.D. Ca. 2018)................................................................34

*Smith v. Bayer Corp.*,
  564 U.S. 299 (2011)...........................................................................................31

*Torres v. S.G.E. Mgmt., L.L.C.*,
  838 F.3d 629 (5th Cir. 2016) .............................................................................23

*Trelltex, Inc. v. Intecx, LLC*,
  494 S.W.3d 781 (Tex. App.—Houston [14th] 2016, no pet.) ............................48

*Trois v. Apple Tree Auction Ctr., Inc.*,
  882 F.3d 485 (5th Cir. 2018) .............................................................................28

*Unger v. Amedisys, Inc.*,
  401 F.3d 316 (5th Cir. 2005) .......................................................................23, 56

*URI, Inc. v. Kleberg County*,
  543 S.W.3d 755 (Tex. 2018) ............................................................4, 42, 43, 44

*Walden v. Fiore*,
  571 U.S. 277 (2014)...........................................................................................28

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...........................................................................................16

*Wenokur v. AXA Equitable Life Ins. Co.*,
  No. 17-cv-00165, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017) ....................29, 34

*Whittington v. Taco Bell of Am., Inc.*,
  10-CV-01884-KMT-MEH, 2011 WL 1772401 (D. Colo. May 10, 2011) ........33

*Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
  100 F. App'x. 296 (5th Cir. 2004).....................................................................55

*Zeidman v. J. Ray McDermott & Co., Inc.*,
  651 F.2d 1030 (5th Cir. 1981) ...........................................................................31

## STATUTES AND RULES

28 U.S.C. § 1292 .......................................................................................1

28 U.S.C. § 1332 .......................................................................................1

28 U.S.C. § 2072(b) ................................................................................29

Tex. Bus. & Com. Code § 1.303 .............................................................45

Fed. R. Civ. P. 12(b) ....................................................15, 16, 30, 32, 35

Fed. R. Civ. P. 12(g) ...............................................................................31

Fed. R. Civ. P. 23 ..................................................... 1, 16, 23, 29, 34, 54

Fed. R. Civ. P. 82 ...................................................................................29

## OTHER AUTHORITIES

2 W. Rubenstein, Newberg on Class Actions § 6:26 (5th ed. June 2018 Update) ...29

Restatement (Second) of Contracts § 84, cmt. b......................................48

Restatement (Second) of Contracts § 222(1) ...........................................44

11 Williston on Contracts § 32:7 (4th ed.)..............................................42

13 Williston on Contracts § 39:22 (4th ed.)............................................48

*Variable Annuities: What You Should Know*, U.S. Securities and Exchange Commission, https://www.sec.gov/reportspubs/investor-publications /investorpubsvaranntyhtm.html (April 18, 2011) .............................................13

The district court had subject matter jurisdiction over the dispute between citizens of different states in which more than $75,000 was in dispute, pursuant to Section 1332 of Title 28 of the United States Code.

This Court has jurisdiction over this appeal pursuant to Section 1292(e) of Title 28 of the United States Code, which permits the Supreme Court to prescribe rules to provide for appeal of an interlocutory decision to the courts of appeals. Rule 23(f) of the Federal Rules of Civil Procedure authorizes this Court to permit an appeal from an order granting class certification.

The district court entered the order granting class certification on May 9, 2018. ROA.839. Jackson filed a timely petition for permission to appeal on May 23, 2018, which a motions panel of this Court granted on June 27, 2018.

This Court may also consider exercising pendent appellate jurisdiction over the order denying Jackson's motion for summary judgment, ROA.1127, which is "inextricably intertwined" with the appealable class certification order. *Escobar v. Montee*, 895 F.3d 387, 391 (5th Cir. 2018) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 524-30 (1985)). Both orders involve the identical issue of the proper method of contract interpretation.

1.      Whether an objection to personal jurisdiction with respect to the claims of unnamed members of a putative class is "available" for purposes of Rule 12 before the class has been certified.

2.      Whether the district court abused its discretion in certifying the class action, including whether errors of law affected the district court's evaluation of commonality and conclusion that common questions of law or fact predominate over individual questions, including:

   (a) whether the district court correctly held that knowledge of industry custom and usage are irrelevant to contract interpretation;

   (b) whether the district court correctly concluded that Jackson's affirmative defenses—which turn on the subjective knowledge of individual plaintiffs and their agents—do not present individualized issues; and

   (c) whether variations in state law on these questions preclude certification of a nationwide class.

3.      Whether the district court correctly certified the class even though the plaintiffs failed to present a damage model demonstrating that damages can be calculated on a classwide basis.

This appeal presents two important issues of class certification. The first is procedural and concerns preservation of objections to personal jurisdiction. In light of *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773 (2017), the district court lacked personal jurisdiction over Jackson with respect to the claims of more than two-thirds of the class.

When Jackson raised this objection to certification of a nationwide class, the district court determined that Jackson had waived its objections to personal jurisdiction by not including them in an earlier motion to dismiss. ROA.851. This holding is both unprecedented and wrong. No authority requires a defendant to move to dismiss the claims of unnamed members before certification. Put simply, "until certification there is no class action but merely the prospect of one[.]" *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 n.22 (2d Cir. 2013).

This Court should clarify that before certification, the claims of unnamed members of a putative class are merely hypothetical and that a defendant need not—and cannot—move to dismiss them for lack of personal jurisdiction.

The second issue concerns substantive contract law. Plaintiffs assert an unusual liability theory. Their current interpretation of the contract is inconsistent with the understanding they (through their broker) had at the time the contract was formed. ROA.2785-86. Indeed, the entire industry—including the SEC—rejects

Plaintiffs' interpretation. ROA.2814-16; ROA.2000. And many class members (such as the Original Named Plaintiffs) received prospectuses illustrating precisely how Jackson interprets the contract. ROA.2914-15; ROA.3386-88.

In certifying the class, the district court held that contract interpretation was a common issue based solely on the contract language, without regard to the surrounding circumstances or Plaintiffs' individual knowledge. But this was error: Texas law requires courts interpreting contracts to consider "surrounding facts and circumstances" that "provide context [to] elucidat[e] the meaning of the words employed." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 765 (Tex. 2018).

And Plaintiffs' knowledge of how Jackson would calculate the charges is highly relevant to Jackson's affirmative defenses of waiver, ratification, and reformation. The district court failed to recognize that these defenses created individual issues because it applied the wrong legal standard. *See* ROA.867 (stating that waiver and ratification require knowledge of "the lawfulness of Jackson's conduct").

Liability in this case cannot be adjudicated without considering the circumstances surrounding each individual's contract formation and each individual's subjective knowledge of Jackson's surrender charge calculations. The individual issues therefore predominate over any common issues in the case.

Appellant Jackson National Life Insurance Company is a life insurance company that provides retirement income and savings products, including variable annuities. ROA.61. A variable annuity "is intended to be a long-term, tax-deferred investment vehicle for retirement." ROA.2721. A variable annuity essentially combines a mutual-fund type of diversified investment with insurance that provides some guarantee of value and permits earning to grow tax-deferred. This case concerns one aspect of variable annuities: "surrender charges" imposed on early withdrawals from variable annuities.

Appellees are a nationwide class of all persons who purchased variable annuity products from Jackson and incurred surrender charges. ROA.873. Although this appeal concerns class certification, evaluating whether common or individual issues predominate requires this Court to have a fairly detailed understanding of the claims and defenses at issue.

### *Tim Hightower sues Jackson on behalf of his clients*

The case was originally filed by fourteen named plaintiffs (the "Original Named Plaintiffs") who are all Texas residents and clients of a single financial advisor: Tim Hightower. Jackson barred Hightower from selling its products because his "re-entry" investment strategies treated variable annuities as short-term rather than long-term investments. *See* ROA.3749 (noting "several client complaints

regarding the nature of [Hightower's] investment strategies and activities");
ROA.2779-2780 (Hightower testifying about termination).

After he was terminated, Hightower ghost-wrote letters and complaints about
Jackson for his clients to send to regulatory agencies. *E.g.*, ROA.2754 (testimony);
ROA.2590; ROA.2596; ROA.2641 (Texas Department of Insurance complaints).

Hightower later retained legal counsel—Appellees' Counsel—on his clients'
behalf. David Cruson's original fee agreement provided that "Hightower Financial"
would pay his attorney's fees. *See* ROA.2693 ("Hightower Financial has agreed to
pay our legal fees for this matter under a separate contingent fee agreement.").[2] At
his deposition, Hightower admitted that this lawsuit was just one "strategic move"
in his campaign against Jackson. ROA.2774-75. One of the Original Named
Plaintiffs testified: "[This lawsuit] has been done on my behalf by Tim Hightower."
ROA.2797.

### Hightower alleges that Jackson and the entire insurance industry miscalculate "surrender charges"

Hightower's theory of liability against Jackson concerns "surrender charges,"
charges incurred when customers withdraw too much money too quickly from their
variable annuities. There is no dispute that these charges are disclosed to customers

---

[2] This agreement was later superseded by an agreement that did not mention
Hightower Financial.

when they purchase variable annuities.  The dispute concerns only how the charges are calculated.

The amount paid by a customer into a variable annuity is called a "premium." ROA.282.  The value of the contract is the "contract value."  Because premiums are invested, the "contract value" ordinarily exceeds the sum of the premiums.  The "earnings" is defined as the difference between the two.  ROA.293.

Jackson incurs up-front costs when customers purchase variable annuities, such as a commission paid to the customer's broker.  In some contracts, Jackson also adds a "contract enhancement" (for example, an additional 6%) to each premium paid.  ROA.2722; ROA.283.  For example, if a customer deposits an initial premium of $50,000, Jackson might pay $3,000 in commission to the broker and add an additional "contract enhancement" of $3,000 to the customer's account, leaving the customer with a total contract value of $53,000.  Because variable annuities are long-term investment vehicles, Jackson can incur these initial expenses because it expects to recoup them over time.

Complications arise when the customer withdraws money from a variable annuity shortly after purchasing it.  Jackson—and other companies—would not be in business for long if a customer could pay a $50,000 premium and immediately withdraw $53,000.

The variable annuity industry thus charges money to recover these up-front costs when customers withdraw too much money too quickly. "Withdrawal Charges" compensate companies for expenses such as the commissions paid to brokers. *See* ROA.283 (definition). Similarly, "Recapture Charges" permit the company to recover any contract enhancement. ROA.283 (definition). Both types of charges are "surrender charges."[3]

The annuities contracts explain that "[t]he Withdrawal Charge is equal to the Withdrawal Charge percentage applied to the portion of Remaining Premium withdrawn." ROA.292. The "Recapture Charge" is "equal to the Recapture Charge percentage applied to the portion of Remaining Premium withdrawn." ROA.293. Any withdrawal is taken first from earnings, then from remaining premiums, and then from contract enhancements. ROA.293.

---

[3] "Surrender charges" are also sometimes referred to as "contingent deferred sales charges." ROA.2902.

These charges decrease over time. Here is how they appear in a sample contract:

| Withdrawal Charge Schedule: | Completed Years Since Receipt of Premium | Withdrawal Charge Percentage |
|---|---|---|
| | 0 | 7.50% |
| | 1 | 7.00% |
| | 2 | 6.00% |
| | 3 | 5.50% |
| | 4 | 4.75% |
| | 5 | 3.75% |
| | 6 | 3.00% |
| | 7 | 2.00% |
| | 8 | 1.00% |
| | 9+ | 0.00% |
| Recapture Charge Schedule: | Completed Years Since Receipt of Premium | Recapture Charge Percentage |
| | 0 | 6.00% |
| | 1 | 5.50% |
| | 2 | 4.50% |
| | 3 | 4.00% |
| | 4 | 3.50% |
| | 5 | 3.00% |
| | 6 | 2.00% |
| | 7 | 1.00% |
| | 8 | 0.50% |
| | 9+ | 0.00% |

ROA.276.[4]

### *Jackson's calculation of surrender charges*

Calculation of these charges is straightforward. If the customer withdraws $10,000 of premium from an account subject to a 7.5% Withdrawal Charge percentage, the customer owes $750 in withdrawal charges. Jackson subtracts this amount from the check, and the customer receives $9,250.[5]

---

[4] The contracts also permit certain free withdrawals that are not subject to surrender charges. *See* ROA.293 ("Additional Free Withdrawal.").

[5] This example does not include other charges and exceptions that might apply to a withdrawal.

On their withdrawal form, a customer can either specify the total amount to withdraw—a "gross" withdrawal—or the amount that the customer would like to receive—a "net" withdrawal. ROA.5000. In the example above, if the customer requests a "gross" withdrawal for $10,000, Jackson would withdraw $10,000 and send the customer $9,250. The contracts explain to customers that the "actual reduction in Contract Value . . . may be greater than the withdrawal amount paid" to the customer. ROA.293.

Jackson also permits the customer to specify the amount of money that they would like to receive. ROA.5000. Thus, in the example above, if a customer requests a $9,250 "net" withdrawal, Jackson would calculate that a $10,000 withdrawal would be necessary to send a $9,250 check. Again, the contracts explain that the "actual reduction in Contract Value . . . may be greater than the withdrawal amount . . . requested" by the customer. ROA.293.

Plaintiffs accuse Jackson of employing convoluted calculus involving the sum of an infinite series and of imposing withdrawal charges upon withdrawal charges. ROA.450. To be clear, straightforward algebra allows Jackson to determine the necessary withdrawal when the customer asks to receive a particular amount:

$$amount\ received = withdrawal - withdrawal \times charge\ percentage$$

This can be simplified as:

$$amount\ received = withdrawal \times (1 - charge\ percentage)$$

To solve for the withdrawal amount, the formula is then expressed as:

$$\frac{amount\ received}{(1 - charge\ percentage)} = withdrawal$$

ROA.2091-92, ROA.2095-96. This formula shows that in the example above, a $10,000 withdrawal is necessary when a customer requests a check for $9,250.[6]

### *Plaintiffs' theory of surrender charges*

Plaintiffs' theory of surrender charges is more complicated.[7] It was devised by Tim Hightower and Rory McDonald, Tim Hightower's employee and son-in-law. ROA.2789-90. Hightower and McDonald's theory is that money withdrawn from a variable life annuity to pay for a surrender charge is not actually withdrawn. According to them, only money sent to the customer is truly "withdrawn" (and subject to withdrawal charges).

Thus, if a customer requests a $10,000 "gross withdrawal," Jackson should not actually "withdraw" $10,000. Instead, if the Withdrawal Charge percentage is 7.5%, Jackson should only withdraw $9,302.33, send the customer that amount, and then reduce the contract value by (but not "withdraw") an additional $697.67.

---

[6] $withdrawal = \frac{amount\ received}{(1-7.5\%)} = \frac{\$9,250}{(1-0.075)} = \frac{\$9,250}{(.925)} = \$10,000$

[7] Indeed, at times, Plaintiffs appear to have embraced Jackson's calculations. *See, e.g.*, ROA.1694 ("Plaintiffs' Counsel: "If they . . . would simply charge you a withdrawal charge -- in this case of this example, $1,000 -- and they send you the check minus the $1,000, . . . we would be exactly where we're supposed to be[.]").

11

According to Plaintiffs, here is how Jackson should calculate how much of the withdrawal requested by the customer is truly a withdrawal:

$$gross\ withdrawal = \ withdrawal + withdrawal \times charge\ percentage$$

$$gross\ withdrawal = \ withdrawal \ \times (1 + charge\ percentage)$$

$$amount\ actually\ "withdrawn" = \frac{gross\ withdrawal\ requested\ by\ customer}{1 + charge\ percentage}$$

In Plaintiffs' view, the rest of the withdrawal requested by the customer should be taken from the account by Jackson but not actually "withdrawn."

### *Jackson follows standard industry practices*

It undisputed that Jackson's calculation of surrender charges follows standard industry practices. McDonald testified that he spoke with other brokers in the industry, and their "consistent" understanding is "that Jackson is calculating surrender charges . . . correct[ly] as per the contract." ROA.2814. Other participants in the industry "understood how [surrender charges] were calculated" and "thought that it was being calculated pursuant to the contract." ROA.2814; *see also* ROA.2816 (no one else in the industry thinks that the examples in Appendix B are inconsistent with the contracts); ROA.3840-42 (Hightower testimony that Jackson follows "industry standard" practices).

Indeed, the SEC's website correctly explains how surrender charges will be calculated:

> In the first year, you decide to withdraw $5,000, or one-half of your contract value of $10,000 (assuming that your contract value has not

increased or decreased because of investment performance). In this case, you could withdraw $1,000 (10% of contract value) free of surrender charges, but you would pay a surrender charge of 7%, or $280, on the other $4,000 withdrawn.

ROA.2000 (quoting *Variable Annuities: What You Should Know*, U.S. Securities and Exchange Commission, https://www.sec.gov/reportspubs/investor-publications/ investorpubsvaranntyhtm.html (April 18, 2011)).

A second example provided on the SEC's website is consistent:

[You spend $20,000 to purchase] a new variable annuity, which pays a 4% bonus credit and has a surrender charge period of eight years, with surrender charges beginning at 9% of purchase payments in the first year. Your account value in this new variable annuity is now $20,800. During the first year you hold the new annuity, you decide to withdraw all of your account value because of an emergency situation. Assuming that your account value has not increased or decreased because of investment performance, you will receive $20,800 minus 9% of your $20,000 purchase payment, or $19,000.

*Variable Annuities: What You Should Know*, *supra*; *see also* ROA.1735 (discussing this example).

### *Hightower's clients—including the Original Named Plaintiffs—knew how surrender charges would be calculated*

Not only did the industry as a whole share Jackson's understanding of the meaning of the contract language, but Hightower has testified that he personally shared Jackson's understanding before he orchestrated the filing of this lawsuit. At the time Hightower recommended Jackson's variable life annuities to his clients, Hightower correctly understood how Jackson would calculate surrender charges. ROA.2785. And Hightower correctly understood these charges at the time they were

13

incurred by his clients. ROA.2786 (he was "predicting exactly what the surrender charge would be . . . [a]ccording to the way Jackson's system works").

Because Hightower acted as the agent of his clients, his knowledge is imputed to them, regardless whether he actually communicated it. That said, Hightower testified at his deposition that on "each and every occasion" he would "[f]ully explain the withdrawal charges in the contract to the customers when they purchased an annuity." ROA.2785.

It is unclear how widespread this knowledge or this practice was among the brokers that represented members of the nationwide class. Hightower is the only broker who was deposed before certification.

The Original Named Plaintiffs also received a copy of Appendix B to the prospectuses at the time they purchased their annuities. ROA.2914. Appendix B illustrates, unambiguously, how Jackson would calculate its surrender charges. ROA.2914-2915; ROA.3386 (Appendix B); ROA.3390 (same).

Finally, Jackson's customers also received notice of the surrender charges when they were incurred. The transaction confirmations sent to each customer detail the charges, showing (consistent with the contracts and Hightower's explanation) that the "total withdrawal" includes money withdrawn to pay surrender charges. ROA.3548-3711. Notably, no customer complained until Hightower brought this lawsuit on his clients' behalf.

### *The Original Named Plaintiffs sue Jackson*

Hightower executed his strategy and had his clients (and the lawyers he arranged for them) file this lawsuit in November 2016. ROA.25. The fourteen Original Named Plaintiffs were all Texas residents, ROA.28-30, who all purchased variable life annuities from Jackson through Tim Hightower. They brought suit on behalf of themselves and a putative nationwide class. ROA.37-43.

The complaint acknowledges that Jackson "is organized as an insurance company under the laws of the State of Michigan and maintains its principal place of business and headquarters in Lansing, Michigan." ROA.30.

Jackson moved to dismiss all the claims under Rule 12(b)(6) for failing to state a claim. ROA.55. Jackson also moved to dismiss the claims of three named plaintiffs—Dale Morris, Janice Morris, and Ronald Wyatt—for lack of subject matter jurisdiction under Rule 12(b)(1) because they have not alleged that they actually incurred any surrender charges. ROA.70.

Jackson did not move to dismiss any claims for lack of personal jurisdiction under Rule 12(b)(2). Jackson acknowledges that personal jurisdiction exists over Jackson with respect to the claims of the Original Named Plaintiffs (who are all Texas residents), and as detailed below, Jackson contends that the claims of unnamed members of the class were not before the court (and thus not subject to dismissal) before certification.

15

The district court denied the motion to dismiss under Rule 12(b)(6) but granted the motion to dismiss the claims of the three plaintiffs who had not incurred surrender changes. ROA.524.

In its answer, Jackson noted the jurisdictional issues that would arise in the future if a nationwide class were certified:

> To the extent that a class outside of Texas is certified, denied that this Court has personal jurisdiction over Jackson for the remaining two-thirds of the putative class members residing outside of Texas.

ROA.609.

### Plaintiffs seek certification of a nationwide class

Following discovery, Plaintiffs moved to certify a nationwide class under Rule 23(b)(3). ROA.1991; ROA.2010.[8] Their theory was simple: The court should interpret the contract and determine there was a breach on a classwide basis, based only on the face of the contracts. ROA.2013. Their expert swore that damages "will be determinable by using relevant mathematical calculations appropriately applied to the available information." ROA.2139.

Jackson opposed certification, first noting that given individual issues—such as the knowledge of industry understanding, the knowledge of the agent who sold

---

[8] Plaintiffs also sought to certify an "injunctive relief class" under Rule 23(b)(2). ROA.2014. The district court denied certification of this class because certification under Rule 23(b)(2) is unavailable when "when each class member would be entitled to an individualized award of monetary damages." ROA.872 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61 (2011)).

the customer the policy, the explanation given by the agent to the customer, and whether the customer received Appendix B—liability cannot be evaluated on a classwide basis. ROA.2300-01. An individual plaintiff's subjective knowledge affects both contract interpretation, ROA.2305-06, and Jackson's affirmative defenses, including waiver and ratification. ROA.2314-15. Jackson also noted plaintiffs' failure to show that damages are calculable on a classwide basis. ROA.2310-13.

Finally, Jackson argued that the district court could not certify a nationwide class because the district court would lack personal jurisdiction over Jackson with respect to the claims of class members located outside of Texas. ROA.2318. As the Supreme Court recently held, similarity between the claims of in-state and out-of-state plaintiffs does not permit a court to exercise personal jurisdiction with respect to the claims of out-of-state plaintiffs. *See* ROA.2319-20 (discussing *Bristol-Myers Squibb Co. v. Superior Ct.*, 137 S. Ct. 1773, 1779-81 (2017)).

In reply, Plaintiffs argued that Jackson waived any objection to personal jurisdiction because Jackson "did not challenge . . . personal jurisdiction in its motion to dismiss." ROA.3871. Notably, aside from waiver, Plaintiffs did not develop any argument that the court could exercise personal jurisdiction over Jackson with respect to the claims of unnamed class. ROA.3871 n.7.

17

Jackson then filed a sur-reply answering Plaintiffs' waiver argument, explaining that Jackson could not have moved to dismiss the claims of unnamed members of putative class in its Rule 12 motion:

> Jackson has not waived any personal jurisdiction objection with regard to claims of nonresident putative class members because none were before this Court at the time Jackson filed its first Rule 12(b) motions, nor are they before this Court now. Putative class members are not within a court's power until after certification.

ROA.4986-87.

The district court held a hearing on class certification in March 2018.

### *The named plaintiffs change after the class certification hearing*

In April 2018, after class certification briefing was complete and more than one month after the hearing, Plaintiffs filed two unusual motions. ROA.767; ROA.781. First, ten of the eleven remaining Original Named Plaintiffs moved to dismiss their claims against Jackson "so that they can pursue different claims against Jackson in Texas State Court." ROA.767. They recognized that their involvement with Tim Hightower—and his admission that the entire lawsuit was simply a "strategic move" in his campaign against Jackson—would "entangl[e] the class with issues that are unique" to them. ROA.767.[9] The sole remaining Original Named

---

[9] Despite of the testimony of Suzanne Housewright that this suit "has been done on my behalf by Tim Hightower," ROA.2797, Plaintiffs represented to the district court that "the relationship that Plaintiffs had with Tim Hightower have nothing whatever to do" with the claims asserted in the case. ROA.767. *But see* ROA.2774-75 (Hightower testifying that this suit is a "strategic move" in his dispute with Jackson).

Plaintiff—David Cruson—elected not to pursue any individual claims against Jackson. ROA.768 n.1. Jackson did not oppose this voluntary dismissal.

Second, weeks later, Plaintiffs moved to amend their complaint and add a new named plaintiff: John Denman. ROA.781. Plaintiffs asserted that "Mr. Hightower is not Mr. Denman's broker." ROA.793.

Jackson strenuously opposed this late addition of another named plaintiff, ROA.5013, which conflicted with the court's scheduling order. ROA.5017. And although it was true that Hightower was not Denman's broker, Plaintiffs neglected to mention that Denman's broker worked at Hightower Financial—the firm owned by Mr. Hightower. ROA.5021.

Jackson explained that it had been given no opportunity to take any discovery regarding Denman. *See* ROA.5022 (noting "no opportunity to seek written discovery from Mr. Denman, to take Mr. Denman's deposition, to engage in third-party discovery regarding Mr. Denman or his broker, or to address his potentially unique circumstances in Jackson's briefs and oral argument on class certification"). Without discovery, Jackson had no ability to challenge whether Denman would make a suitable class representative.

### *The district court certifies a nationwide class*

In May 2018, the district court granted all three motions filed by plaintiffs in a single order. ROA.839. The court first granted the dismissal and permitted the

amendment, noting that Denman "complains of the same surrender charge calculation." ROA.847. The opinion does not address Jackson's inability to conduct discovery regarding Denman. ROA.847-48.

The court then considered personal jurisdiction, concluding that "Jackson waived its defense to personal jurisdiction by failing to timely move or plead such a defense." ROA.851.

The district court agreed with Plaintiffs that the interpretation of the contract is a common question of law. ROA.855-57. "Given the uniformity of Jackson's contracts and actions, the contention of breach is a common question." ROA.857. Because the contracts were "form contracts," the district court found that no individual extrinsic evidence could be relevant to interpreting their terms. ROA.865.

Turning to Jackson's affirmative defenses, the court concluded that these individual issues did not preclude certification because the defenses are meritless. ROA.867 (rejecting "the contention that an annuity policyholder could have gained 'full knowledge'"). Incorrectly borrowing a standard from a Pennsylvania district court, the court held that waiver and ratification would be inapplicable because customers "could not have been aware of the lawfulness of Jackson's conduct until either liability is established or Jackson admits that its actions were unlawful." ROA.867. For reasons not fully explained in the opinion, the court found that the

subjective knowledge of individual class members would be susceptible to "common methods of proof." ROA.868.

### *The district court stays the proceeding pending this appeal*

Jackson petitioned this Court for permission to appeal the district court's class certification order and requested that the district court stay proceedings while the appeal was pending. ROA.945; ROA.933. The district court granted the stay except with respect to Jackson's pending summary judgment motion. ROA.1073.

In a footnote, the order granting the stay explained the failure of the class certification order to address Jackson's explanation that its objections to personal jurisdiction were not waived because the claims of unnamed class members were not before the court until certification. ROA.1078. The footnote appears to suggest that Jackson waived its arguments by first raising them in the sur-reply:

> The Court did not address this argument in the Certification Order because Jackson first raised the argument in its Sur-Reply in Response to Plaintiffs' Opposed Motion for Class Certification and Appointment of Class Counsel (Dkt. #81 at pp. 9-10). (See Dkt. #57 at pp. 23-25).

ROA.1078 n.1.[10]

This Court granted Jackson's petition for interlocutory appeal. ROA.1120.

---

[10] As discussed below, this analysis is incorrect. Jackson raised the issue of personal jurisdiction in its opposition to class certification. Plaintiffs then argued, in their reply, that Jackson had waived its personal jurisdiction arguments. Jackson then responded to Plaintiffs' waiver arguments in its sur-reply, its first opportunity to answer them.

### *The district court denies Jackson's motion for summary judgment*

Finally, in August 2018, with this appeal pending, the district court denied Jackson's motion for summary judgment. ROA.1127. The order first held that the prospectus, including Appendix B, could not be considered in interpreting the contracts. ROA.1134. Then, it concluded that Jackson "failed to prove as a matter of law that it properly calculates and applies the surrender charge." ROA.1140-41.

The order does not analyze the inconsistency between Plaintiffs' current interpretation of the contracts and the understanding of these charges that Plaintiffs, at least one of their brokers, the SEC, and the entire insurance industry shared at the time of contract formation. ROA.1137-41.

This Court reviews a district court's class certification decisions for abuse of discretion. *Pederson v. La. State Univ.*, 213 F.3d 858, 866 (5th Cir. 2000). A district court that commits an error of law "necessarily abuses its discretion." *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635 (5th Cir. 2016); *accord Koon v. United States*, 518 U.S. 81, 100 (1996).

Because of the due process concerns inherent in class certification decisions, "the Supreme Court requires district courts to conduct a rigorous analysis of Rule 23 prerequisites." *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005).

Certification of a class under Rule 23(b)(3) first requires a plaintiff to demonstrate that "the class is too numerous to allow simple joinder; there are common questions of law or fact; the claims or defenses of the class representatives are typical of those of the class; and the class representatives will adequately protect the interests of the class." *Sandwich Chef of Texas, Inc. v. Reliance Nat. Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003). The plaintiff must also "show that the common issues predominate, and that class treatment is the superior way of resolving the dispute." *Id.*

To determine whether the requirements of Rule 23 have been met, "a court must understand the claims, defenses, relevant facts, and applicable substantive law." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

Evaluating predominance requires a court to "inquire how the case will be tried." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003). The question is what substantive issues will control the outcome, which issues will predominate, and whether those issues are common. *Id.* In general, predominance requires "generalized evidence which proves or disproves an element on a simultaneous, class-wide basis" and which "obviates the need to examine each class members' individual position." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002).

This Court should reverse the order granting class certification for three independent reasons.  First, the district court lacks personal jurisdiction over Jackson with respect to the claims of plaintiffs outside of Texas, and it should not have certified a class encompassing these claims.  The district court erred in holding that Jackson waived its objection to personal jurisdiction with respect to the claims of unnamed members of the putative class.  Before certification, there is no "justiciable controversy between [a defendant] and the unnamed putative class members," and "any claims that [unnamed putative class members] might have . . . necessarily exist only by hypothesis."  *In re Checking Account Overdraft Litigation*, 780 F.3d 1031, 1033 (11th Cir. 2015).  Jackson was not required to move to dismiss these claims before certification.

Second, contract interpretation and Jackson's affirmative defenses all require individual inquiries into the specific circumstances of each individual's knowledge, contract formation, and actions, which predominate over common issues.  Contract interpretation requires considering the circumstances surrounding formation and whether an individual had knowledge of industry usage.  And because many class members had full knowledge—both at the time of formation and when the charges were incurred—of how Jackson would calculate surrender charges, Jackson has strong defenses of waiver, ratification, and reformation.

Third, because Plaintiffs failed to put forward a damages model, they failed to show "that damages can be decided on a class-wide basis." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410-11 (5th Cir. 2017). Their expert's vague assurances that damages could be calculated using "relevant mathematical calculations appropriately applied," ROA.2139, are insufficient to carry their burden.

## I. The District Court Erred Because It Lacks Personal Jurisdiction Over Jackson with Respect to the Claims of Unnamed Class Members Unconnected to Texas.

The district court should not have certified a nationwide class. Under principles of personal jurisdiction recently reaffirmed by the Supreme Court, the Due Process Clause permits the district court to exercise personal jurisdiction over Jackson only with respect to claims related to Jackson's contacts with Texas.

The district court erred in holding that Jackson waived its objections to personal jurisdiction by not moving to dismiss these claims in its initial Rule 12 motion. Until certification, unnamed class members are not parties (in any sense) and their claims are not before the court. Jackson could not have moved to dismiss them.

### A. The district court lacks personal jurisdiction over Jackson with respect to the claims of customers who purchased annuities outside of Texas.

A federal court sitting in diversity may exercise personal jurisdiction over a defendant only if "(1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).

It is undisputed that the district cannot exercise general jurisdiction over Jackson, which is incorporated and has its principal place of business in Michigan. The district court's exercise of jurisdiction over Jackson necessarily rests on specific personal jurisdiction, which is based on a connection between the claims and the forum. *Walden v. Fiore*, 571 U.S. 277, 283 n.6, 283-86 (2014).

Specific personal jurisdiction is "a claim-specific inquiry." *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018). Whether specific personal jurisdiction exists in a breach of contract claim depends on "only those acts which relate to the formation of the contract and the subsequent breach." *Id.*

Here, because the named plaintiffs (both the original and current) formed their contracts with Jackson in Texas and the alleged breaches occurred when Jackson sent checks to their Texas addresses, the district court could exercise specific personal jurisdiction over Jackson with respect to their claims.

But there was no basis for the Texas district court to exercise specific personal jurisdiction over Jackson with respect to the claims of individuals who have no connection to Texas. This includes the majority of the class certified by the district court. ROA.802 (Live Complaint: "[O]n information and belief, less than one-third of all Class Members reside in the State of Texas.").

The Supreme Court recently reaffirmed that specific jurisdiction must be evaluated separately for each plaintiff and each claim. *Bristol-Meyers Squibb Co. v.*

*Superior Court of California*, 137 S. Ct. 1773, 1780 (2017). Similarity between the claims of in-state plaintiffs and out-of-state plaintiffs cannot give rise to personal jurisdiction when "all the conduct giving rise to the nonresidents' claims occurred elsewhere." *Id.*; *see also Seiferth v. Helicopteros Attuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006) ("Permitting the legitimate exercise of specific jurisdiction over one claim to justify the exercise of specific jurisdiction over a different claim that does not arise out of or relate to the defendant's forum contacts would violate the Due Process Clause.").

These principles of personal jurisdiction apply to class actions. Rules of procedure—including Rule 23—"shall not abridge, enlarge or modify any substantive right." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 612-13 (1997) (quoting 28 U.S.C. § 2072(b)). The Federal Rules of Civil Procedure expressly provide that the rules "do not extend . . . the jurisdiction of the district courts." Fed. R. Civ. P. 82.

Commentators have recognized that *Bristol-Meyers Squibb* indicates "that neither general nor specific jurisdiction exists over nationwide class suits except in the defendant's home states." 2 W. Rubenstein, Newberg on Class Actions § 6:26 (5th ed. June 2018 Update); *see also Wenokur v. AXA Equitable Life Ins. Co.*, No. 17-cv-00165, 2017 WL 4357916, at *4 (D. Ariz. Oct. 2, 2017) (refusing to certify a nationwide class on this basis); *Practice Mgmt. Support Servs., Inc. v. Cirque du*

*Soleil, Inc.*, No. 14-C-2032, 2018 WL 1255021, at \*3 (N.D. Ill. Mar. 12, 2018) (noting that the court cannot "exercis[e] personal jurisdiction over non-Illinois-resident class members").

## B. Jackson did not forfeit its objection to personal jurisdiction by not moving to dismiss the claims of unnamed members of the putative class in its Rule 12(b) motion.

The district court rejected Jackson's personal jurisdiction argument only because it concluded that Jackson forfeited any objections to personal jurisdiction by failing to raise them in its Rule 12 motion. The district court was incorrect—before class certification, the unnamed members of the putative class were not before the court; their claims were not subject to dismissal; and the absence of personal jurisdiction was not "available" for purposes of Rule 12.

### 1. Before certification, the claims of unnamed class members are not before a court and are not subject to dismissal.

Unnamed members of a putative class are not "parties" whose claims may be dismissed under Rule 12(b)(2). To the contrary, "a class action, when filed, includes only the claims of the named plaintiff or plaintiffs." *Gibson v. Chrysler Corp.*, 261 F.3d 927, 940 (9th Cir. 2001). "The claims of unnamed class members are added to the action later, when the action is certified as a class under Rule 23." *Id.* "[U]ntil certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 n.22 (2d Cir. 2013); *see also Biscone v. JetBlue*

*Airways Corp.*, 681 F. Supp. 2d 383, 386 (E.D.N.Y. 2010) ("As a general rule, until a class action is certified pursuant to Rule 23 of the Federal Rules of Civil Procedure, the claims of potential class members cannot be considered.").

"[T]he act of certification br[ings] the unnamed members of the class before the court[.]" *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1045 (5th Cir. 1981); *see also Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976) (without class certification, "the action is not properly a class action."). Although an unnamed member of an uncertified class is not a party, "an unnamed member of a *certified* class may be considered a 'party'" for some purposes. *Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011).

Until the district court certified the class, the action below included only the claims of the named plaintiffs. Because the claims of unnamed putative class members were not before the court, Jackson could not have moved to dismiss those claims, whether for personal jurisdiction or otherwise. Jackson's answer described the procedural posture perfectly: Personal jurisdiction difficulties did not currently exist but would arise in the future "[t]o the extent that a class outside of Texas is certified." ROA.609.

Rule 12(g)(2) prevents a party from making a "motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). Because the objection to personal jurisdiction

with respect to the hypothetical claims of unnamed class members of the putative class was not available at the time Jackson filed its Rule 12(b) motion, Jackson was not required to—and could not have—included the objection in its Rule 12 motion.

### 2. Cases involving arbitration clauses confirm this result.

Cases involving arbitration clauses confirm the status of the claims of unnamed class members before certification. In *In re Checking Account Overdraft Litigation*, the Eleventh Circuit reversed a district court's determination that Wells Fargo waived the right to compel arbitration of the claims of unnamed class members by failing to move to compel arbitration before certification. 780 F.3d 1031, 1033 (11th Cir. 2015). There was no "justiciable controversy between Wells Fargo and the unnamed putative class members" until certification. *Id.* at 1037. "Certification of a class is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power." *Id.* Before certification, their claims are merely hypothetical: "[B]ecause the unnamed putative class members are not yet before the court, any claims that they might have against Wells Fargo necessarily exist only by hypothesis." *Id.* The district court thus had no jurisdiction to compel arbitration of these claims before certification. *Id.*; *see also Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1239 (11th Cir. 2018) ("[W]e have found no authority that

requires a party to file a conditional arbitration motion against possible future adversaries."). District courts routinely apply these principles.[11]

These cases apply equally here. In the same way that a defendant need not—and cannot—move to compel arbitration of the hypothetical claims of unnamed members of a putative class, a defendant cannot move to dismiss these hypothetical claims for lack of personal jurisdiction. Until certification, there was no justiciable controversy between Jackson and the unnamed members of the putative class.

### 3. No case has provided a reasoned analysis to the contrary.

No case—including the decision below—has provided any reasoned basis that would allow a court to rule on the claims of unnamed members of a putative class before certification. The decision below does not analyze the issue.

---

[11] *See, e.g.*, *Laguna v. Coverall N. Am., Inc.*, No. 09-2131, 2011 WL 3176469, at *8 (S.D. Cal. July 26, 2011) (unpublished) ("Defendants cannot move to compel arbitration against putative class members prior to certification of a class."); *Hafer v. Vanderbilt Mortg. & Fin., Inc.*, 793 F. Supp. 2d 987, 1010 n.12 (S.D. Tex. June 24, 2011) ("The Court does not hereby rule on the arbitrability of the claims of putative class members. Given that no class has been certified, such a ruling would be premature."); *Whittington v. Taco Bell of Am., Inc.*, 10-CV-01884-KMT-MEH, 2011 WL 1772401, at *5 (D. Colo. May 10, 2011) (explaining that there is "no procedure or authority . . . to compel putative class members, who are not currently before the court . . . to arbitrate their potential claims against Defendants"); *Elliott v. KB Home N. Carolina, Inc.*, 752 S.E.2d 694, 702 (N.C. App. 2013) ("[W]e do not hold that Defendant could have, or should have, moved to compel arbitration with respect to the unnamed class members before the class was certified.").

In opposing Jackson's Rule 23(f) petition, Plaintiffs cited several cases, but none provides a reasoned analysis supporting Plaintiffs. Two cases note that a Rule 12 motion was filed in a putative nationwide class action prior to certification.[12] Two cases involve challenges to personal jurisdiction with respect to the claims of named plaintiffs prior to certification.[13]

Three cases cited by Plaintiffs actually address personal jurisdiction challenges to the claims of unnamed members of a putative class prior to certification. Two cases granted motions to dismiss, but neither analyzes the status of the claims of unnamed class members before certification.[14]

The third case, *Chernus v. Logitech,* No. CV 17-673(FLW), 2018 WL 1981481 (D.N.J. April 27, 2018), recognized that "to determine whether this Court has specific jurisdiction over Defendant with respect to the claims of the unnamed class members prior to class certification would put the proverbial cart before the horse." *Id.* at *8. Because putative class members were "not yet parties in the case—

---

[12] *In re Centurylink Sales Practices and Securities Litigation*, MDL No. 17-2795, 2018 WL 2122869 (D. Minn. 2018); *Wenokour v. AXA Equitable Life Ins. Co.*, No. CV-17-00165-PHX-DLR, 2017 WL 4357916 (D. Ariz. Oct. 2, 2017).

[13] *Parsons v. Whirlpool Corp*., No. 17-13561, 2018 WL 2296473 (E.D. Mich. May 21, 2018); *Sloan v. General Motors,* 287 F. Supp. 3d 840 (N.D. Ca. 2018).

[14] *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.,* No. 17-CV-00564 NC, 2017 WL 4224723 (N.D. Cal. Sept. 22, 2017); *Chavez v. Church & Dwight Co., Inc.,* No. 17-C-1948, 2018 WL 2238191 (N.D. Ill. 2018).

and they may not be—absent class certification," the court declined to address personal jurisdiction, encouraging the defendant to "re-raise this issue at the class certification stage." *Id.*

Every court to consider the issue has recognized that the claims of unnamed members of a putative class are not before a court prior to certification. Jackson's personal jurisdiction objection to these "hypothetical" claims was not available until after the class was certified.[15]

Jackson properly preserved its personal jurisdiction arguments, and they should have been considered by the district court in determining the scope of any class.

### 4. Jackson did not waive its response to Plaintiffs' waiver arguments.

In its order granting a stay pending appeal, the district court suggested a second layer of waiver: that Jackson waived its response to Plaintiffs' waiver arguments. *See* ROA.1078 n.1 (noting that Jackson "first raised the argument [about the status of unnamed members of a putative class] in its Sur-Reply").

---

[15] Following certification of the class, Jackson moved to dismiss the claims of the non-Texas plaintiffs under Rule 12(b)(2). ROA.882. This motion remains pending before the district court. ROA.1078 n.1 ("If necessary, the Court will address Jackson's motion to dismiss following the Fifth Circuit's ruling on the appeal of the Certification Order.").

This analysis is incorrect. Jackson explained the personal jurisdiction defects in its opposition to class certification. ROA.2319-20. In their reply, Plaintiffs argued (for the first time) that Jackson had waived any objections to personal jurisdiction. ROA.3871. Jackson's sur-reply was its first opportunity to respond to Plaintiffs' waiver arguments. ROA.4986-87.

Such a response is precisely the purpose of sur-reply: "A surreply, when allowed, 'is limited to addressing only new arguments raised for the first time by the opposing party in their reply briefing and not included in the original motion.'" *Branch v. CEMEX, Inc.*, No. H-11-1953, 2012 WL 2357280, at \*9 (S.D. Tex. June 20, 2012) (Rosenthal, J.) (quoting *Marbury Law Grp., PLLC v. Carl*, 729 F. Supp. 2d 78, 83 (D.D.C. 2010)); *see also Hanson Pipe & Products, Inc. v. Bridge Techs., LLC*, 351 F. Supp. 2d 603, 614 (E.D. Tex. 2004), *aff'd*, 160 F. App'x 380 (5th Cir. 2005) ("Con/Span's reply brief, however, was the first instance in which Con/Span [raised an argument]. Hanson's sur-reply would have been the appropriate time to counter Con/Span's argument, but Hanson chose to waive the opportunity.").

Indeed, if Jackson had not been given an opportunity to respond, then the district court would have erred if it had considered the waiver arguments in Plaintiffs' reply: "It is well established 'that a district court may rely on arguments . . . presented for the first time in a reply brief as long as the court gives the

nonmovant an adequate opportunity to respond.'" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 491 F. Supp. 2d 690, 704-05 (S.D. Tex. 2007).

Jackson did not waive its objections to personal jurisdiction with respect to the claims of unnamed members of the putative class. And Jackson did not waive its response to Plaintiffs' waiver arguments.

### C. A court should not certify a class encompassing claims with respect to which the court lacks personal jurisdiction over the defendant.

When a district court lacks personal jurisdiction over a defendant with respect to claims, it should not certify a class that includes those claims. The Second Circuit's approach to Article III in class actions illustrates this principle. Under the Second Circuit's rule,[16] "no class may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *accord Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010).

But this does not mean that defendants should seek to dismiss the claims of unnamed putative class members for lack of standing. Instead, the Second Circuit requires courts to consider standing in defining the scope of a class: "The class must therefore be defined in such a way that anyone within it would have standing."

---

[16] This Court has not yet taken sides in the circuit split regarding Article III standing and class definitions. *See In re Deepwater Horizon*, 739 F.3d 790, 801 (5th Cir. 2014) (noting the split). We cite the doctrine merely to show that it is an issue of class definition, rather than grounds for a motion to dismiss.

*Denney*, 443 F.3d at 264. This approach should be followed for personal jurisdiction.

In the class action context, this Court has recognized the need for "ongoing refinement and give-and-take inherent in . . . the formation of a workable class definition." *In re Monumental Life Ins. Co.,* 365 F.3d 408, 413-14 (5th Cir. 2004). Part of that "give-and-take" in crafting a class definition should be defining a class so that the district court can exercise personal jurisdiction with respect to the claims of unnamed class members.

This not a case where the district court might arguably lack personal jurisdiction over a small number of plaintiffs. Instead, the district court lacks personal jurisdiction over Jackson with respect to the claims of more than two-thirds of the class. ROA.802.

The district court lacked personal jurisdiction over Jackson with respect to the claims of class members with no connection to Texas. Jackson properly raised this argument in objecting to class certification, and the district court abused its discretion by certifying a nationwide class, which includes claims with respect to which this Court lacks personal jurisdiction over Jackson.

## II. The District Court Erred in Analyzing Commonality and Concluding that Common Issues Predominate over Individual Issues.

Certification of a Texas class might be proper if this case involved a "form contract, executed under like conditions by all class members." *Sacred Heart Health*

*Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1171 (11th Cir. 2010).[17] But these contracts were not executed "under like conditions."

First, different customers received different contract materials. ROA.2914. Some of these materials—like Appendix B—illustrated precisely how surrender charges would be calculated. The precise materials received by a particular customer are highly relevant to interpreting that contract and evaluating the reasonableness of Plaintiffs' interpretation.

Second, different customers received different explanations of surrender charges from their brokers. ROA.3548-3711. Many customers—such as Hightower's clients—were fully aware of Jackson's understanding of the contract language at the time they purchased annuities. ROA.3548-3711; ROA.2785-86. This individual knowledge is highly relevant both to contract interpretation and to Jackson's affirmative defenses.

These inquiries into the specific circumstances of a customer's purchase of a variable annuity, including what documents they received and what information their broker knew and conveyed, are individual inquiries. If they are necessary to adjudicate liability, either as part of Plaintiffs' burden or part of Jackson's affirmative defenses, then individual issues predominate over common ones. *Cf.*

---

[17] Assuming that Plaintiffs could provide a damage model demonstrating that damages could be calculated on a classwide basis. *See infra*, pp. 54-56.

*New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*, 477 F. App'x 809, 813 (2d Cir. Apr. 30, 2012) (noting that inquiries into class members' actual knowledge "would require many individual inquires, outweighing the common issues").

## A. Individual issues related to contract interpretation predominate over common issues.

Liability turns on contract interpretation. The district court erred by holding that liability presents a common issue of fact—contract interpretation requires considering evidence of the knowledge and circumstances specific to each individual plaintiff.[18]

---

[18] In its order certifying the class, the district court erroneously held that the contract was unambiguous merely because "neither party asserts that the contract is ambiguous." ROA.864. This approach was error: "Whether a contract is ambiguous, however, is a question of law, and thus the parties' failure to raise the issue is not determinative." *Milner v. Milner*, 361 S.W.3d 615, 619 (Tex. 2012). In its subsequent order denying Jackson's motion for summary judgment, the district court correctly acknowledged that "[a] court may conclude that a contract is ambiguous even in the absence of such a pleading by either party." ROA.1135 (quoting *Sage St. Assocs. v. Northdale Const. Co.*, 863 S.W.2d 438, 445 (Tex. 1993)).

Jackson believes that the analysis in the district court's summary judgment order can be considered by this Court in evaluating the order certifying the class. If not, this Court can reverse the class certification based solely on the district court's error in assuming that the contract was unambiguous merely because "neither party asserts that the contract is ambiguous." ROA.864.

To the extent that this Court agrees that the district court's approach to contract interpretation was error, it may be appropriate to vacate the order denying summary judgment for Jackson through the exercise of pendent jurisdiction.

The heart of the contract interpretation dispute is the word "withdrawal." Surrender charges (both withdrawal and recapture charges) are calculated as a percentage of "the portion of Remaining Premium withdrawn." ROA.292; ROA.293. And surrender charges are "deducted from the remaining Contract Value." ROA.292; ROA.293.

The dispute turns on whether this "deduction" is a "withdrawal." In Jackson's view, all money taken from the account is "withdrawn," whether that money is sent to the customer or used to pay surrender charges. In Plaintiffs' view, only money sent to the customer is "withdrawn." The remainder is a "deduction" but not a "withdrawal."

To be clear, Jackson does not believe that the annuity contracts are ambiguous. The base contract language, standing alone, demonstrates that Jackson has properly calculated surrender charges. The plain meaning of "withdrawal" includes money withdrawn to pay surrender charges. The individual evidence merely confirms this plain text, and it need not be considered if a court were to agree that the base contract language supports Jackson. The contracts can—and should—be interpreted in Jackson's favor on a classwide basis.

But if the base contract language does not unambiguously support Jackson, then contract interpretation presents an individual, plaintiff-specific issue.

Evaluating liability would require considering the specific context of each customer's contract formation.

To determine the meaning of a contract, Texas courts consider "surrounding facts and circumstances" that "provide context [to] elucidat[e] the meaning of the words employed." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 765 (Tex. 2018). These surrounding circumstances include "the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (quoting 11 Richard A. Lord, Williston on Contracts § 32.7 (4th ed. 1999)). Two types of extrinsic evidence are particularly relevant.

First, "the contract may be read in light of the circumstances surrounding its execution to determine whether an ambiguity exists." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015); *see also Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 388 (5th Cir. 1981) ("[I]t is proper to consider the contract's commercial setting even though the contract is not facially ambiguous.").

In this case, many class members received a prospectus with an attached Appendix B, which illustrates precisely how the surrender charges would be calculated. ROA.2914-16; ROA.3386 (Appendix B). For individuals who purchased a variable annuity after a prospectus, Appendix B forms part of the

surrounding circumstances that a court must consider in determining the meaning of the contract language. *See Aetna Life & Cas. Co. v. Gunn*, 628 S.W.2d 758, 760 (Tex. 1982) (explaining that the wording of an instrument must be considered "in light of the surrounding circumstances"). The prospectuses are objective evidence of surrounding circumstances that will assist in "ascertaining objective meaning." *URI*, 543 S.W.3d at 768.

The district court refused to consider Appendix B because it concluded that the contracts are "fully integrated." ROA.1131-34. This was error—as the cases above demonstrate, even fully integrated contracts must be interpreted in light of the circumstances surrounding their formation. The contract language cannot be interpreted apart from the commercial setting in which it was agreed to. The district court erred by holding that the parole evidence rule precluded consideration of these surrounding circumstances. ROA.1134. And Appendix B does not "vary or contradict the terms of the subject policies," ROA.1134, it merely confirms the objective meaning that a "withdrawal" does not cease to be a withdrawal when it used to pay a surrender charge.

Different members of the class received different documents. Because the surrounding circumstances vary from individual to individual, contract interpretation constitutes an individual—not a common—inquiry.

Second, critically, "trade usage can illuminate the meaning of contract language." *URI*, 543 S.W.3d at 768. "[T]he meaning to which a certain term or phrase is most reasonably susceptible is the one which [is] so regularly observed in place, vocation, trade or industry so 'as to justify an expectation that it will be observed with respect to a particular agreement.'" *Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995) (quoting Restatement (Second) of Contracts § 222(1)). Extrinsic evidence is properly considered to show "the commonly understood meaning of the term within a particular industry." *Coterill-Jenkins v. Texas Med. Ass'n Health Care Liab. Claim Tr.*, 383 S.W.3d 581, 588 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

The record in this case shows a particularly well-established industry usage. *See* ROA.2814 (testimony of the Plaintiffs' expert is that the "consistent" understanding of industry professionals is that Jackson is correct); ROA.2000 (discussing the SEC's website). The industry uniformly understands that "withdrawal" includes money withdrawn to pay surrender charges.

The industry-wide meaning of terms is, of course, susceptible to classwide proof. But whether individual class members can be charged with the industry understanding of withdrawal presents an individual, plaintiff-specific question.

To enforce the industry usage against any individual class member, Jackson must demonstrate that the individual class member was aware of the industry usage.

44

*See Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 85 (5th Cir. 1979) (noting that both parties "were aware of this custom and usage in the grain trade" and "negotiated this contract pursuant to that custom and usage"); *see also* Tex. Bus. & Com. Code § 1.303(d) (explaining that usage of trade is relevant if it is one "of which [the parties] are or should be aware").

This necessarily requires an inquiry into each individual plaintiff's knowledge at the time of contract formation. The evidence shows that some class members— including the Original Named Plaintiffs—had the industry understanding of surrender charges explained to them by their brokers. But this analysis necessarily requires consideration on an individual, not a classwide basis.

The district court's order denying Jackson's motion for summary judgment does not discuss the plaintiffs' knowledge of industry usage in interpreting the contract. ROA.1137-41.

Because the circumstances of contract formation and knowledge of industry usage must be considered, contract interpretation is an individual—not a common— issue. The district court erred in its analysis of commonality and predominance, and certification of the class was an abuse of discretion.

### B. Jackson's affirmative defenses establish that individual issues predominate over common issues.

Moreover, even if contract interpretation presented a common issue, individual inquiries would still be necessary to adjudicate Jackson's affirmative

defenses. "The predominance of individual issues necessary to decide an affirmative defense may preclude class certification." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 420 (5th Cir. 2004).

Jackson's affirmative defenses—waiver, ratification, and reformation—rely on the subjective knowledge of individual plaintiffs. They present individual issues that cannot be decided on a classwide basis.

### 1. Many class members were fully aware of Jackson's calculations of the surrender charges.

Tim Hightower, the only broker from whom discovery has been taken, informed his clients of how Jackson would calculate surrender charges at the time they purchased the variable annuities and at the time the surrender charges were incurred. ROA.2785-86. And when customers incurred surrender charges, Jackson would send a statement showing the amount of the withdrawal and the around of the surrender charge. *E.g.*, ROA.3548. Until this lawsuit, Jackson never received a complaint about its calculations.

At least some members of the class (including all of the Original Named Plaintiffs and at least one of the current named plaintiffs):

- Purchased a variable annuity knowing how Jackson would calculate surrender charges;

- Requested withdrawals and incurred surrender charges knowing how Jackson would calculate the amount of those specific surrender charges; and

46

- Remained silent for extended periods of time after Jackson collected surrender charges from them.

These facts—based on each individual plaintiff's knowledge and conduct—form the basis of Jackson's affirmative defenses.

### 2. Waiver and ratification require individual determinations.

Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). "Prolonged silence or inaction in not asserting a known right is conduct that may amount to waiver." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 66 (Tex. 2015) (internal quotation marks omitted). Similarly, ratification can occur when a party accepts payment under a contract, an act that is inconsistent with avoiding the contract. *See id.* (noting, *inter alia*, "that Hooks regularly accepted royalty checks" on the amended contract).

Jackson has strong arguments that class members like the Original Named Plaintiffs waived any objections to the surrender charge calculations or ratified Jackson's calculations by purchasing variable annuities, requesting surrender charges, and remaining silent after receiving surrender charges, with full knowledge of the material fact. These affirmative defenses will require individual inquiries into the knowledge and actions of each class member, overwhelming predominance. *See Sacred Heart Health Systems*, 601 F.3d at 1177, 1178 (noting that "[t]he risk of voluminous and individualized extrinsic proof runs particularly high where a

defendant raises substantial affirmative defenses to breach" and that individual questions predominate "where the defendant proffers individualized and varying evidence . . . [of] what [class members] knew or should have known about" (internal quotation marks omitted)).

The district court rejected this argument based on an error of law, concluding that these defenses "require plaintiffs to have full knowledge of the circumstances," including knowledge of "the lawfulness of Jackson's conduct." ROA.867. Thus, the district court reasoned, the defenses were meritless: "[Plaintiffs] could not have been aware of the lawfulness of Jackson's conduct until either liability is established or Jackson admits that its actions were unlawful." ROA.867.

But this is the wrong standard. Under Texas law, "[p]roof regarding a party's actual understanding of the legal consequences of those facts is not required, as parties are presumed to know and understand the legal effect of their contracts and waivers." *Trelltex, Inc. v. Intecx, LLC*, 494 S.W.3d 781, 792 (Tex. App.—Houston [14th] 2016, no pet.) This is "because one who signs a contract is presumed to know and understand its contents," and accordingly, "the failure to read a contract, or to apprehend the rights and obligations under it, will not prevent a waiver of its terms or conditions." 13 Williston on Contracts § 39:22 (4th ed.).

The Restatement expressly rejects the requirement that waiver requires "full knowledge of legal rights." *See* Restatement (Second) of Contracts § 84, cmt. b

(describing the view that "the promisor must know his legal rights" as an "incorrect inference" because "it is sufficient if he has reason to know the essential facts").

The district court relied on two cases. Neither applies Texas law, and neither supports the standard adopted by the district court. One case, *Allen v. Holiday Universal*, examined whether a plaintiff waived the right to have a contract declared void for illegality—not whether class members waived (or ratified) a purported breach of the contract. 249 F.R.D. 166, 169 (E.D. Pa. 2008).

Similarly, in *In re Checking Account Overdraft Litigation*, the liability theory was not simply breach of contract but also included allegations that Wells Fargo "did not disclose its manipulations to its customers, and took active steps to keep elements of this scheme secret." 307 F.R.D. 630, 634 (S.D. Fla. 2015). Unlike Jackson's customers, the plaintiffs in that case thus did not have "full knowledge" of the material facts.

The district court committed an error of law when it "reject[ed] any contention that an annuity policyholder could have gained 'full knowledge'" of Jackson's calculations. ROA.867. Under a correct legal standard, Jackson has presented viable (indeed, strong) affirmative defenses of waiver and ratification, which present individual issues that predominate over common issues.

### 3. Reformation turns on individual issues of knowledge.

Jackson has also raised the affirmative defense of reformation. ROA.929.[19] Reformation of a written contract should occur when "a contract was actually made, but the written memorandum thereof, because of a mutual mistake, does not truly reflect the actual agreement of the parties." *Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 382 (Tex. 1965); *see also id.* ("Reformation is a proper remedy when the parties have reached a definite and explicit agreement, understood in the same sense by both, but, by their mutual or common mistake, the written contract fails to express this." (internal quotation marks omitted)).

This case presents precisely the circumstances that warrant reformation. The Original Named Plaintiffs—through Hightower, their broker—correctly understood how Jackson would be calculating surrender charges at the time they purchased the annuities. ROA.2785-86. That is, there was a meeting of the minds between the

---

[19] Jackson pleaded this defense in its answer to the Second Amended Class Action Complaint. ROA.891. The district court granted Plaintiffs leave to file their Second Amended Complaint in the order granting class certification. ROA.839. Jackson thus had no opportunity to brief the defense during the class certification process, and it should be considered by this Court in reviewing the order granting class certification.

In the alternative, this Court could vacate the order granting class certification on procedural grounds: The district court erred by permitting the plaintiffs to amend their complaint (and add a new class representative) in its order granting class certification, ROA.839, without first giving Jackson the opportunity to answer the amended complaint and to conduct discovery regarding the new representative.

parties regarding how surrender charges would be calculated, a definite agreement understood in the same sense by both. And Jackson has followed the approach that the parties agreed to. ROA.2786 (Hightower was "predicating exactly what the surrender charge would be . . . [a]ccording to the way Jackson's system works").

Plaintiffs' theory of liability is simply that the contract language used by the parties failed to capture their actual agreement.[20] In these circumstances, the remedy is to reform the written contract to match the parties' agreement. Even if Plaintiffs were correct about contract interpretation, the language of the contracts should be reformed to match their shared understanding of surrender charges.

Like waiver and ratification, the affirmative defense of reformation turns on the subjective knowledge and intent of individual plaintiffs. The district court erred by failing to identify Jackson's affirmative defenses as creating individual issues.

### C. Plaintiffs failed to carry their burden to establish that variations in state law do not defeat predominance and superiority.

Finally, the district court failed to consider adequately how variations in state law affect predominance. "A district court's duty to determine whether the plaintiff has borne its burden on class certification requires that a court consider variations in

---

[20] At a minimum the evidence shows that the Original Named Plaintiffs knew (through their broker) of Jackson's understanding of the legal effect of the contract language. Plaintiffs' knowledge of Jackson's mistake about the legal significance of the contract language is the equivalent of mutual mistake. *See, e.g.*, *Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex. 1988) ("Unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake.").

state law when a class action involves multiple jurisdictions." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996). The failure to consider how variations in state law affect predominance and superiority "mandates reversal." *Id.*

In seeking class certification, Plaintiffs acknowledged that certifying a nationwide class would require considering "the law of the 50 states and the District of Columbia." ROA.2013. But the survey of state contract law principles that Plaintiffs provided to the district court contained only three columns:

| Contract Law Principles | | | |
|---|---|---|---|
| **State** | **Factfinder Resolves Ambiguity**[1] | **Ambiguity Construed Against Drafter/Insurer** | **Statute of Limitations** |
| **Alabama** | "[O]nce a court determines that an instrument is ambiguous or | "A contract of insurance will be construed strictly against the insurer and | "[A]n action alleging breach of contract is subject to the six-year statute of limitations |

ROA.2233.

The Plaintiffs provided no information to the district court concerning the state variations in the crucial principles of state contract law discussed above. They provided no survey—and the district court did not independently consider—any variations in state law regarding when and what extrinsic evidence can be considered in contract interpretation. As Jackson argued below, there is good reason to believe that these variations would be significant. *See* ROA.2306 n.5 ("There appears to be a significant variation in the laws of the states with respect to the use of extrinsic evidence (including the types of extrinsic evidence that may be used) to determine

whether, as a matter of law, the contract language is ambiguous." (quoting *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 583 (E.D. Mich. 2004))).

The district court noted that courts "routinely certify class actions involving breaches of form contracts." ROA.865. But as the authority quoted by the district court demonstrates, certification is proper only when the form contract was "executed under like conditions by all class members." *Sacred Heart*, 601 F.3d at 1171. The reason that certification is improper in this case is that the contract was not executed "under like conditions by all class members."

Nor did the district court—or Plaintiffs—provide any serious consideration of any variations in state law applicable to Jackson's affirmative defenses. ROA.867-69; *cf. Sacred Heart*, 601 F.3d at 1180-83 (noting significant state variations in the law of waiver in reversing class certification)..

"Plaintiffs have the responsibility to demonstrate that state law variations do not preclude the certification of a nationwide class." *Casa Orlando Apartments, Ltd. v. Fed. Nat. Mortg. Ass'n*, 624 F.3d 185, 195 (5th Cir. 2010). Plaintiffs failed to satisfy this burden, and the district court abused its discretion in certifying a nationwide class without the necessary scrutiny of variations in state law.

\*     \*     \*

Adjudicating contract interpretation and Jackson's affirmative defenses will require a complicated series of individual mini-trials under varying state laws. The

district court erred in identifying common issues, erred in concluding that common issues predominate over individual issues, and abused its discretion in certifying the class.

## III. The District Court Erred in Certifying a Class When Plaintiffs Failed to Provide a Damage Model.

In addition, the district court erred by certifying the class because Plaintiffs provide a tangible damages model demonstrating that damages can be calculated on a classwide basis.

A plaintiff seeking class certification must provide a damage model that "measure[s] only those damages attributable to [the] theory." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.*

"[W]hen plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs must put forward a damages methodology that maps onto [their] liability theory." *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410-11 (5th Cir. 2017). When a district court concludes that that predominance is based on liability and damages, this Court must review the proposed measure of damages to consider "whether . . . the commonality is undone by the damages theory." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 n.36 (5th Cir. 2015).

Plaintiffs seek to recover three types of damages: (1) the alleged excessive surrender charge; and any subsequent effect of this excessive charge (2) on subsequent living benefits paid out over time; and (3) on death benefits payable to the beneficiary. ROA.817 ¶48; *see also* ROA.2139 (expert report in support of class certification). But Plaintiffs failed to provide a damage model showing that these damages can be calculated on a classwide basis.

Rather than proposing a formula at the class certification stage, Plaintiffs relied on their expert's conclusory assertions that damages could be calculated using unspecified "relevant mathematical calculations appropriately applied." ROA.2139. Dr. Janik's affidavit explains that "precise details of how the calculation of these additional damages will be performed will depend on what information Jackson makes available." ROA.2139. This conclusory assurance does not satisfy Plaintiffs' burden to provide a damages model to show that damages are calculable on a classwide basis.

The testimony of Plaintiffs' expert resembles that of the expert in *Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, who opined that "multiple regression analysis could be used to calculate damages." 100 F. App'x. 296, 299 (5th Cir. 2004). This Court found the testimony unpersuasive, explaining that "[t]he expert did not offer a formula based on regression analysis, but merely opined that one

could be found." *Id.* His affidavit merely provided a "preliminary overview of how damages might be calculated." *Id.*

Similarly, Dr. Janik did not offer a formula to calculate damages but merely opined that a formula could be found. ROA.2139. References to "relevant mathematical calculations appropriately applied" are nothing more than a preliminary overview of damages.

Without a damages model, neither this Court nor the district can engage in the "rigorous analysis of Rule 23 prerequisites" required by due process. *Unger v. Amedisys, Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). Because Plaintiffs failed to "put forward a damages methodology that maps onto [their] liability theory," the district court abused its discretion in certifying the class. *Slade*, 856 F.3d at 410-11.

## CONCLUSION & PRAYER FOR RELIEF

This Court should reverse the order certifying the class and either render judgment that no class should be certified or remand for further consideration. At a minimum, this Court should render judgment that any class should be limited to Texas plaintiffs to ensure that the district court can exercise specific personal jurisdiction over Jackson.

Dated: October 17, 2018

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

By: /s/ *William R. Peterson*

William R. Peterson
David J. Levy
Thomas R Davis
Rachel H. Stinson
Jason F. Muriby
1000 Louisiana St., Ste. 4000
Houston, TX 77002
(713) 890-5188

Scott T. Schutte
77 West Wacker Drive, Suite 500
Chicago, IL 60601
(312) 324-1000

***Counsel for Appellant, Jackson National Life Insurance Company***

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2018, I electronically transmitted this Brief of Appellant to the Clerk of the Court using the Court's ECF system. I further certify that counsel of record for Plaintiffs–Appellees are being served with a copy of this Brief by electronic means via the Court's ECF system, or by email, as follows:

### *Counsel for Plaintiffs-Appellees*

Lewis T. LeClair
Rudolph "Rudy" Fink IV
Samuel Franklin Baxter
MCKOOL SMITH, P.C.
300 Crescent Court Suite 1500
Dallas, TX 75201
 (214) 978-4000

Gary D. Corley
CORLEY LAW FIRM
108 North Travis Street
Sherman, TX 75090
(903) 892-1048

*/s/    William R. Peterson*
William R. Peterson

## CERTIFICATE OF COMPLIANCE WITH RULE 32(C)(2)

1.      This petition complies with the type-volume limitations of Federal Rule of Appellate Procedure 5(c) because this brief contains 11,878 words, excluding the parts exempted by Fifth Circuit Rule 5 and Federal Rule of Appellate Procedure 32(f).

2.      This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14-point font.

*/s/ William R. Peterson*
William R. Peterson

Dated: October 17, 2018